FILED
2012 Apr-18  AM 09:05
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **HUBERT GLYNN KING,** *as the Personal Representative of the Estate of Willie Lyle King, Deceased,* | ) ) ) ) ) | |
| Plaintiff, | ) | Civil Action Number |
| **vs.** | ) | **5:11-cv-2269-AKK** |
| | ) | |
| **GENERAL MOTORS CORPORATION, et al.,** | ) ) ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION</u>

Before the court is General Motors of Canada, Ltd.'s ("GM Canada") motion to dismiss Hubert Glynn King's ("King") complaint for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2), or, in the alternative, motion for a judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) or Summary Judgment pursuant to Rule 56.  Doc. 11.  For the reasons stated herein, GM Canada's motion for summary judgment is due to be **GRANTED**.

## I.   FACTUAL AND PROCEDURAL HISTORY

This litigation arises from the death of King's wife, Willie Lyle King, in an automobile accident occurring on November 16, 2008.  King alleges that, as he and his wife drove their 2001 Chevrolet Silverado from Tuscaloosa, Alabama to

Madison County, Alabama on Interstate 65, he "maneuvered his vehicle to avoid hitting a deer crossing the road when the vehicle left the roadway and struck a tree." Doc. 1, at 13. The collision killed Willie Lyle King. *Id.* On November 15, 2010, King filed suit against General Motors Corporation ("GM Corporation"), Bill Heard Chevrolet, Inc.-Huntsville ("Bill Heard Chevrolet"), and eighteen (18) fictitious parties including "those entities who or which manufactured or assembled the General Motors vehicle involved in the occurrence made the basis of this lawsuit, any component part thereof, or any attendant equipment used or available for use therewith." *See id.* at 11-12. Moreover, King provided that "the identities of the fictitious party defendants herein are otherwise unknown to the plaintiff at this time or, if their names are known to plaintiff, their identities as proper party defendants are not known to the plaintiff at this time and their true names will be substituted by amendment when ascertained." *Id.* at 12. King, as the personal representative of his wife's estate, alleges negligence and violations of Alabama's Extended Manufacturer's Liability Doctrine, and seeks punitive damages pursuant to Alabama's Wrongful Death Act. *See id.* at 14-16. King also seeks compensatory damages for mental anguish. *See id.* at 16.

On May 10, 2011, while this action was still pending in the Circuit Court of Madison County, Alabama, King substituted GM Canada for all fictitious parties. *Id.* at 10. King asserts that he performed such substitution "[u]pon information received by counsel for Plaintiff regarding the proper identity of the manufacturer of the subject vehicle." Doc. 15, at 3.

After King amended his complaint, GM Canada removed the case from Madison County to this court on June 24, 2011 pursuant to 28 U.S.C. §§ 1332, 1441, and 1446. Doc. 1, at 1-2. In its notice of removal, GM Canada first asserted that "because plaintiff filed this action after both [GM Corporation and Bill Heard Chevrolet] filed petitions for Chapter 11 bankruptcy . . . this action as to these entities is *void ab initio*." *Id.* at 2-3 (citing *id.* at 19-54) (bankruptcy petitions of GM Corporation and Bill Heard Chevrolet). GM Canada further contends that it is a Canadian Corporation with its principle office and place of business in Ontario, Canada, doc. 12, at 33, and that it "does no business in the United States, including the State of Alabama, and does not maintain any office, agency, or representative there. GM Canada is not qualified, registered, licensed, or authorized to do business in Alabama. GM Canada does not have any officers, employees, or agents stationed to work for it in Alabama." *Id.* GM Canada admits that, prior to GM Corporation's bankruptcy filing, it operated as a wholly-owned subsidiary of GM Corporation. *Id.* at 34. Currently, GM Canada operates as a wholly-owned subsidiary of General Motors Holdings LLC. *Id.*

While GM Canada is a wholly-owned subsidiary, "GM Canada has always had its own Board of Directors and Officers, performed its own accounting, and been responsible for its own financial performance." *Id.* Additionally, prior to GM Corporation's bankruptcy, GM Canada manufactured vehicles and component parts in Canadian plants and then sold these products to GM Corporation in Canada, with transfer of title also occurring in Canada. *Id.* GM Corporation, in

turn, imported and distributed these vehicles in the United States. *Id.* at 34-35. As it relates to the vehicle at issue here, GM Canada assembled the 2001 Chevrolet Silverado in Canada and subsequently sold it to GM Corporation in Canada. *Id.* at 35. "GM Canada did not design the 2001 Chevrolet Silverado . . . GM Canada also did not advertise or market the subject vehicle and did not distribute or sell it, or any of its component parts, to the decedent or plaintiffs in this action or to any dealership or member of the general public in Alabama or elsewhere." *Id.*

On the other hand, King maintains that GM Canada operates "'under the auspices of GM [Corporation].'" Doc. 15, at 4 (quoting doc. 15-7, at 6). King contends that the same corporate representatives assist both GM Corporation and GM Canada in litigation matters. *Id.* at 5 (citing doc. 15-7, at 9). Moreover, "GM [Corporation], who designed the subject vehicle platform, oversees the production of vehicles at GM Canada, promulgates standards and demonstrates the assembly of various components of the vehicle." *Id.* (citing doc. 15-7, at 27). Finally, King alleges that GM Canada "specifically manufactured" the vehicle at issue "to be in compliance with the Federal Motor Vehicle Safety Standards" as opposed to complying with Canadian safety standards. *Id.* at 6 (citing doc. 12, at 61).

Furthermore, King's Silverado had VIN #2GCEC19T411183134. Doc. 1, at 13. GM Canada contends that, pursuant to regulations issued by the National Highway Traffic Safety Administration ("NHTSA"), "the first three characters of a VIN number must identify the manufacturer of the vehicle using its unique World Manufacturer Identifier, or WMI code." Doc. 12, at 13 (citing 49 C.F.R.

565.6(a)).  Accordingly, "2GC" refers to GM Canada as the Silverado's manufacturer.  *Id.*  The Silverado also contains a certification label on the driver's door edge, which provides the standard "GM logo," the vehicle's VIN number, that "General Motors of Canada LTD" manufactured the vehicle, the date of manufacture, and that the vehicle "conforms to all applicable U.S. Federal Motor Vehicle Safety Standards in effect on the date of manufacture shown above."  *See* doc. 12, at 61.  King does not dispute that "[t]here was a sticker on the inside of the driver's side door on the wrecked vehicle that contains" this information.  Doc. 15, at 9 n.2.

On November 22, 2011, GM Canada filed the current motion seeking to dismiss for lack of personal jurisdiction or, in the alternative, for a judgment in its favor due to an expired statute of limitations.  Doc. 11.  This motion is fully briefed, docs. 15, 16, and ripe for review.

## II.   STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 12(b)(2), "'[a] plaintiff seeking the exercise of personal jurisdiction over a nonresident defendant bears the initial burden of alleging in the complaint sufficient facts to make out a prima facie case of jurisdiction.'"  *Diamond Crystal Brands, Inc. v. Food Movers Int'l, Inc.*, 593 F.3d 1249, 1257 (11th Cir. 2010) (quoting *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1274 (11th Cir. 2009)).  If the nonresident defendant "'challenges jurisdiction by submitting affidavit evidence in support of its position, "the burden traditionally shifts back to the plaintiff to produce evidence supporting

jurisdiction.'"" *Id.* (quoting *Mazer*, 556 F.3d at 1274 (quoting *Meier ex rel. Meier v. Sun Int'l Hotels, Ltd.*, 288 F.3d 1264, 1269 (11th Cir. 2002))). If "'the plaintiff's complaint and supporting evidence conflict with the defendant's affidavits, the court must construe all reasonable inferences in favor of the plaintiff.'" *Id.* (quoting *Meier*, 288 F.3d at 1269).

Moreover, "[j]udgment on the pleadings is appropriate when there are no material facts in dispute, and judgment may be rendered by considering the substance of the pleadings and any judicially noticed facts." *Hawthorne v. Mac Adjustment, Inc.*, 140 F.3d 1367, 1370 (11th Cir. 1998) (citing Fed. R. Civ. P. 12(c)). The court must "accept the facts in the complaint as true" and "view them in the light most favorable to the nonmoving party." *Id.* As such, the "complaint must not be dismissed 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Id.* (quoting *Slagle v. ITT Hartford*, 102 F.3d 494, 497 (11th Cir. 1996)).

Finally, under Federal Rule of Civil Procedure 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." To support a summary judgment motion, the parties must cite to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers, or other materials." *Id.* The moving party bears the initial burden of proving the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323

(1986).  The burden then shifts to the nonmoving party, who is required to "go beyond the pleadings" to establish that there is a "genuine issue for trial."  *Id*. at 324 (citation and internal quotation marks omitted).  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The court must construe the evidence and all reasonable inferences arising from it in the light most favorable to the non-moving party.  *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970); *see also Anderson*, 477 U.S. at 255 (all justifiable inferences must be drawn in the non-moving party's favor).  However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion."  *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) (citing *Bald Mountain Park, Ltd. v. Oliver*, 863 F.2d 1560, 1563 (11th Cir. 1989)).  Furthermore, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party."  *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252).

## III.   ANALYSIS

As an initial matter, GM Corporation and Bill Heard Chevrolet are due to be **DISMISSED without prejudice** based on their status as Chapter 11 debtors.  *See* doc. 1, at 19-54.[1]  On June 1, 2009, GM Corporation filed Chapter 11 bankruptcy

---

[1] King acknowledges GM Corporation and Bill Heard Chevrolet's bankruptcy status. Doc. 15, at 3, 9.

in the United States Bankruptcy Court of the Southern District of New York, case number 09-50026.  *Id.* at 19.  On September 28, 2008, Bill Heard Chevrolet filed Chapter 11 bankruptcy in the United States Bankruptcy Court of the Northern District of Alabama, case number 08-83028-JAC11.  *Id.* at 43.  "A debtor who has filed for Chapter 11 bankruptcy enjoys an automatic stay against actions to enforce, collect, assess or recover claims against the debtor or against property of the estate."  *United States v. White*, 466 F.3d 1241, 1244 (11th Cir. 2006) (citing 11 U.S.C. § 362(a)).  Accordingly, "'[a]ctions taken in violation of the automatic stay are void and without effect.'"  *Id.* (quoting *Borg-Warner Acceptance Corp. v. Hall*, 685 F.2d 1306, 1308 (11th Cir. 1982) (alteration in original)).  Therefore, King's claims against GM Corporation and Bill Heard Chevrolet are void and without effect.  The court now turns to King's claims against GM Canada.

A.    *Personal Jurisdiction*

        The court first finds that it may exercise personal jurisdiction over GM Canada.  "A federal court sitting in diversity may exercise jurisdiction over a nonresident defendant to the same extent as a court of that state."  *Ruiz de Molina v. Merritt & Furman Ins. Agency, Inc.*, 207 F.3d 1351, 1355 (11th Cir. 2000).  "Alabama permits its courts to exercise jurisdiction over nonresidents to the fullest extent allowed under the Due Process Clause of the Fourteenth Amendment to the Constitution."  *Id.* at 1355-56 (citing *Martin v. Robbins*, 628 So. 2d 614, 617 (Ala. 1993)); *see also* Ala. R. Civ. P. 4.2(b).  The Fourteenth Amendment's due process clause generally "permits a court to summon a non-resident to defend himself in

the forum so long as that person has some 'minimum contacts' with that state, and the exercise of personal jurisdiction over the defendant would not offend 'traditional notions of fair play and substantial justice.'" *Ruiz de Molina*, 207 F.3d at 1356 (citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945); *Williams Elec. Co. v. Honeywell, Inc.*, 854 F.2d 389, 392 (11th Cir. 1988)).  "In resolving a motion for summary judgment based upon lack of personal jurisdiction, the court is required to accept as true the allegations of plaintiff's complaint, and deny the motion if these allegations state a prima facie case of jurisdiction." *Ruiz de Molina*, 207 F.3d at 1356.  Moreover, "[w]here, as here, the defendant submits affidavits contrary to the allegations in the complaint, the burden shifts back to the plaintiff to produce evidence supporting personal jurisdiction, unless the defendant's affidavits contain only conclusory assertions that the defendant is not subject to jurisdiction."  *Stubbs v. Wyndham Nassau Resort and Crystal Palace Casino*, 447 F.3d 1357, 1360 (11th Cir. 2006).

GM Canada submits the affidavit of Geoffery Bailey ("Bailey"), Manager of Regulatory and Cross Vehicle Programs, *see* doc. 12, at 32-38, to refute King's claim of personal jurisdiction over GM Canada.  Bailey testified that GM Canada was originally formed under the laws of Canada and maintains its principal office and place of business in Canada.  *Id.* at 33.  Bailey further provides that GM Canada "does no business in the United States, including the State of Alabama," "is not qualified, registered, licensed, or authorized to do business in Alabama," "does not have any officers, employees, or agents stationed to work for it in

Alabama," and "no one is authorized by GM Canada to accept service of process in Alabama." *Id.*

Bailey admits that GM Canada was a wholly owned subsidiary of GM Corporation, but GM Canada "has always had its own Board of Directors and Officers, performed its own accounting, and been responsible for its own financial performance." *Id.* at 34. Bailey states that GM Canada assembles and sells automotive vehicles and parts in Canada but "has never sold or distributed automotive vehicles or component parts in the United States of America, including Alabama." *Id.* Rather, GM Canada sold vehicles to GM Corporation, "the transfer of title for which occurred in Canada," and GM Corporation "was responsible for their importation into the United States, their distribution within the United States, as well as service and sales support, throughout the United States, including Alabama." *Id.* at 34-35. Furthermore, Bailey contends that GM Corporation, as opposed to GM Canada, "was also responsible for the crash testing and component testing done to certify compliance of the imported vehicles with applicable United States Federal Motor Vehicle Safety Standards." *Id.* at 35. Accordingly, for the allegedly defective vehicle in question, Bailey provides:

> The subject 2001 Chevrolet Silverado was assembled by GM Canada in Canada and then sold to [GM Corporation] in Canada. GM Canada did not design the 2001 Chevrolet Silverado, including its side structure and door hinges. GM Canada also did not advertise or market the subject vehicle and did not distribute or sell it, or any of its component parts, to the decedent or plaintiffs in this action or to any dealership or member of the general public in Alabama or elsewhere.

*Id.*

In response to this affidavit and GM Canada's motion, King focuses on GM Canada's relationship with GM Corporation.  King asserts that "GM Canada is a wholly owned subsidiary of GM [Corporation].  GM Canada manufactured and assembled the side steel structure of the subject vehicle, which was done in conjunction with GM design and testing employees before being distributed to Alabama."  Doc. 15, at 6.  In support, King offers the deposition transcript of Anthony Melocchi, a GM Canada corporate representative, taken in separate litigation in the United States District Court for the Eastern District of Texas.  *See* doc. 15-7.  King provides that Melocchi testified that "GM [Corporation], who designed the subject vehicle platform, oversees the production of vehicles at GM Canada, promulgates standards and demonstrates the assembly of various components of the vehicle."  Doc. 15, at 5 (citing doc. 15-7, at 27).  Moreover, GM Corporation and "GM Canada employees both perform checks on the body structure during assembly of the vehicles manufactured in Canada."  *Id.*  And as such, the "GM Canada plant follows requirements to assemble vehicles during the process of design and development of GM" Corporation—meaning, the vehicle at issue "was specifically manufactured to be in compliance with the Federal Motor Vehicle Safety Standards ('FMVSS') by GM Canada for distribution in the U.S., and not the Canada Motor Vehicle Safety Standards ('CMVSS'), to be distributed in Canada."  *Id.* at 6.  Finally, King contends that GM Canada previously consented to personal jurisdiction in other United States courts.  *Id.* at 8.

Therefore, King asserts that GM Canada maintains the following "contacts" with Alabama as it relates to the current litigation: (1) GM Canada manufactured the vehicle in question and at the time was a wholly owned subsidiary of GM Corporation, the entity that purportedly designed and sold the vehicle to an Alabama dealership; (2) GM Canada manufactured the vehicle to comply with U.S. federal regulations; and (3) GM Canada previously consented to personal jurisdiction within the United States.  Accordingly, King concludes that the relevant law "unequivocally subject[s] GM Canada to personal jurisdiction of this Court."  *Id.* at 6.

The Due Process Clause accepts two types of personal jurisdiction— "general" and "specific" personal jurisdiction.  *See Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S. Ct. 2846, 2853 (2011).  King neglects to assert the type of personal jurisdiction that this court purportedly maintains over GM Canada, but the court assumes King relies on a theory of specific personal jurisdiction.[2]  As it relates to constitutionally "minimum contacts" for specific

---

[2] "General" personal jurisdiction exists over a corporation where "the continuous corporate operations within a state [are] so substantial and of such a nature as to justify suit against it on causes of action arising from dealings entirely distinct from those activities." *Goodyear Dunlop*, 131 S. Ct. at 2853 (quotation marks and citations omitted).  Put simply, the state must be "one in which the corporation is fairly regarded as at home."  *Id.* at 2853-54 (suggesting a corporation's domicile, place of incorporation, and principal place of business as the paradigm bases for the exercise of general jurisdiction).  Here, King presents no evidence that Alabama is GM Canada's domicile, place of incorporation, or principal place of business.  Moreover, King fails to demonstrate that the current facts are analogous to *Perkins v. Benguet Consol. Min. Co.*, 342 U.S. 437 (1952)—the Supreme Court's only decision finding "general jurisdiction appropriately exercised over a foreign corporation that has not consented to suit in the forum." *Goodyear Dunlop*, 131 S. Ct. at 2856 (quotation marks and citation omitted).  And

personal jurisdiction, "the defendant's contacts with the applicable forum must satisfy three criteria." *Vermeulen v. Renault, U.S.A., Inc.*, 985 F.2d 1534, 1546 (11th Cir. 1993). "First, the contacts must be related to the plaintiff's cause of action or have given rise to it." *Id.* (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985). "Second, the contacts must involve 'some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum . . . , thus invoking the benefits and protections of its laws.'" *Id.* (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958) (alteration in original)). "Third, the defendant's contacts with the forum must be 'such that [the defendant] should reasonably anticipate being haled into court there.'" *Id.* (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980) (alteration in original)).

GM Canada argues that it never "purposefully availed" itself to the privilege of conducting activities in Alabama based on the Supreme Court's recent holding in *J. McIntyre Machinery, Ltd. v. Nicastro*, 131 S. Ct. 2780 (2011). *See* doc. 12, at 18-22. The court disagrees. In *McIntyre,* Justice Kennedy, writing for four justices, attempted to clarify the due process standard for specific personal jurisdiction over nonresident defendants and resolve "decades-old questions left open in *Asahi Metal Industry Co. v. Superior Court of Cal., Solano Cty.*, 480 U.S. 102 (1987)." *McIntyre*, 131 S. Ct. at 2785. These open questions from *Asahi*

_____

indeed, GM Canada is in no sense "home" in Alabama. *See id.* at 2857.

concern the extent a court may exercise personal jurisdiction over a product manufacturer when the manufacturer places its product in the "stream-of-commerce," and through national or international commercial channels, the product reaches the forum state. *See id.* at 2787-88. Justice Kennedy held that a "defendant's transmission of goods permits the exercise of jurisdiction only where the defendant can be said to have targeted the forum; as a general rule, it is not enough that the defendant *might have predicted that its goods will reach the forum State.*" *Id.* at 2788 (emphasis added).

Justice Breyer, writing for two justices, concurred in the judgment, but relied on preexisting case law "that a single sale of a product in a State does not constitute an adequate basis for asserting jurisdiction over an out-of-state defendant, even if that defendant places his goods in the stream of commerce, fully aware (and hoping) that such a sale will take place." *Id.* at 2792. Moreover, Justice Breyer's concurrence agreed in *rejecting* the "absolute" argument that, as a general rule, "a producer *is* subject to jurisdiction for a products-liability action so long as it knows or reasonably should know that its products are distributed through a nationwide distribution system that *might* lead to those products being sold in any of the fifty states." *Id.* at 2793 (emphasis added). Perhaps most importantly, both Justice Breyer and Justice Kennedy's opinions appear to focus on the "contemporary commercial circumstances," *id.* at 2794 (Breyer, J., concurring), or the "economic realities of the market the defendant seeks to serve," *id.* at 2790.

The facts in *McIntyre*, however, differ significantly from the facts here because, purportedly, the *McIntyre* defendant could only *predict* that its product might reach the forum state.  In *McIntyre*, the plurality focused on three key "contacts" that the English manufacturer maintained with the forum state, New Jersey.  *Id.* at 2786.  "First, an independent company agreed to sell J. McIntyre's machines in the United States.  J. McIntyre itself did not sell its machines to buyers in this country beyond the U.S. distributor;" second, while J. McIntyre officials attended conventions to advertise its machines in the United States, these conventions never occurred in New Jersey;" and third, "no more than four machines . . . including the machine that caused the injuries that are the basis for this suit, ended up in New Jersey."  *Id.*  The plurality found that such contacts failed to demonstrate that the defendant manufacturer, J. McIntyre, sought to serve the New Jersey market, or, put differently, that "J. McIntyre purposefully availed itself of the New Jersey market."  *Id.* at 2790.  Thus, the plurality held that New Jersey exercising jurisdiction over J. McIntyre "would violate due process."  *Id.* at 2791.  Justice Breyer's concurrence agreed in the result, but also stated that in the interest of "defendant-focused fairness," it "might appear fair in the case of a large manufacturer which specifically seeks, or expects, an equal-sized distributor to sell its product in a distant State" for that distant State to exercise personal jurisdiction over the large manufacturer."  *Id.* at 2793 (Breyer, J., concurring).

Taking the facts presented in the light most favorable to King, the "contemporary commercial circumstances" and "economic realities of the market"

GM Canada "seek[s] to serve," reveal that this court may exercise jurisdiction. Unlike the manufacture in *McIntyre* who utilized an independent U.S. distributor that merely distributed four machines to the state of New Jersey, GM Canada utilized its parent corporation to distribute hundreds, if not thousands, of vehicles to the state of Alabama, including the vehicle at issue.[3]  While the court certainly recognizes that GM Canada is a separate and distinct entity from GM Corporation, there is no doubt that GM Canada "seeks to serve" Alabama when it specifically manufactures GM vehicles, in compliance with federal regulations, and designed by its parent corporation who actively sold these vehicles to an Alabama dealership.  Indeed, GM Canada cannot plead ignorance of the markets it explicitly targets and serves when its parent corporation directly sells the manufactured products to these markets.  *See* doc. 12, at 34.[4]  GM Canada possesses more than some vague awareness that its products *might* reach U.S. markets—it manufacturers vehicles, such as the one at issue, to comply with federal regulations.  *See* doc. 15-7, at 27; doc. 15, at 6.  This equates manufacturing a product "in anticipation of sales in" Alabama.  *See Asahi*, 480 U.S. at 113.  Moreover,  GM Canada specifically sold its products to GM

---

[3] The dissent in *McIntyre* recognized the importance that "economic realities" played in the majority opinions.  131 S. Ct. at 2795 (Ginsberg, J., dissenting) (asserting that the majority opinions allow certain foreign industrialists to avoid "the jurisdiction of our state courts, *except perhaps in States where its products are sold in sizeable quantities*") (emphasis added).

[4] Put differently, the court refuses to allow GM Canada to "Pilate-like wash its hands of a product by having independent distributors market it," *McIntyre*, 131 S. Ct. at 2795 (Ginsberg, J., dissenting), especially where GM Canada's "independent distributor" is its parent corporation.

Corporation for distribution in the United States.  *See* doc. 12, at 34-35.  While GM Canada and GM Corporation may not have created a written distribution agreement, the sale to GM Corporation was clearly not a sale to an end-user. Indeed, the court finds that this commercial relationship mirrors an example provided by Justice O'Connor in *Asahi* of a manufacturer "marketing the product through a distributor who has agreed to serve as the sales agent in the forum State."  480 U.S. at 112.[5]

Thus, this is not the type of case described by the plurality in *McIntyre* where "a small Florida farm might sell crops to a large nearby distributor, for example, who might then distribute them to grocers across the country."  131 S. Ct. at 2790.  Nor is this "an Appalachian potter[] who sells his product (cups and saucers) exclusively to a large distributor, who resells a single item (a coffee mug) to a buyer from a distant State (Hawaii)."  *Id.* at 2793 (Breyer, J., concurring).

---

[5] The Alabama Supreme Court similarly found in *Ex Parte DBI, Inc.*, 23 So. 3d 635, 654-55 (Ala. 2009), that a foreign seatbelt manufacturer was subject to personal jurisdiction in Alabama courts.  The court reasoned that "DBI knew that its seat belts were incorporated into automobiles sold by Kia Motors in the United States.  It is not subject to reasonable dispute that it is generally known that a product such as a mass-produced automobile is marketed on a broad spectrum and is not a boutique product fit for only a narrow class of consumers.  Likewise, an automobile manufacturer is involved in the sales of its products on a national as opposed to a regional basis.  Perhaps the supplier of a part to a snow-plow manufacturer could reasonably say it did not anticipate that its product would be sold in Alabama, but, clearly, moderately priced, fuel-efficient automobiles, such as those manufactured by Kia Motors, are destined for sale in all 50 states in this country.  Kia Motors has nine dealerships in Alabama.  DBI, by choosing to enter into a contractual relationship with Kia Motors pursuant to which DBI would turn a profit by supplying an essential component part vital to the safety of passengers for such automobiles under the circumstances here described, cannot reasonably assert ignorance of these realities of the marketplace."  *Id.*

Here, GM Canada, the entity who built certain vehicles for GM Corporation to distribute specifically in the United States, including Alabama, cannot genuinely maintain that it does not serve the Alabama market.  Stated differently, if not Alabama, what market does GM Canada serve?  As one of these vehicles gave rise to the current cause of action, the economic realities of GM Canada and GM Corporation's commercial relationship establish sufficient "minimum contacts" with Alabama to demonstrate a targeting of Alabama's commercial automobile market and evidence that GM Canada purposefully availed itself to the benefits and privileges of this market.  *See McIntyre*, 131 S. Ct. at 2790.

A due process analysis regarding personal jurisdiction also requires the court to consider the "reasonableness" of exercising jurisdiction.  *Asahi*, 480 U.S. at 113.  "A court must consider the burden on the defendant, the interests of the forum State, and the plaintiff's interest in obtaining relief.  It must also weigh in its determination 'the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and the shared interest of the several States in furthering fundamental substantive social policies.'"  *Id.* (quoting *World-Wide Volkswagen*, 444 U.S. at 292).  Here, GM Canada concludes without analysis that the exercise of jurisdiction in Alabama would not be fair or reasonable. *See* doc. 12, at 22-23.  The court notes that exercising jurisdiction over an international entity must be performed with care; however, given GM Canada's relationship with its former parent corporation, the court finds it reasonable to exercise jurisdiction.  Moreover, the plaintiff and forum's interests are high in this case as

the incident occurred in Alabama to an Alabama resident. *Compare Asahi*, 480

U.S. at 114. Accordingly, the court finds that exercising jurisdiction in this case

comports with due process and GM Canada's motion to dismiss for lack of

personal jurisdiction is **DENIED**.

B.    *Statutory Limitations Period*[6]

However, the applicable statute of limitations bars King's claims against

GM Canada, and accordingly, the court will **GRANT** GM Canada's motion for

summary judgment. Where, as here, a personal representative files suit for "the

wrongful act, omission, or negligence" causing death, Alabama law imposes a two

year limitations period "from and after the death of the testator or intestate." Ala.

Code § 6-5-410(d).[7] Moreover, it "is well settled that the time limitation set out in

§ 6-5-410(d) is part of the substantive cause of action and that it is not subject to

any provision intended to temporarily suspend the running of a limitations period.

The two-year period is not a limitation against the remedy only, because after two

years the cause of action expires." *Ex parte FMC Corp.*, 599 So. 2d 592, 594

---

[6] As both parties present evidence outside of the pleadings regarding the statute of limitations issue, *see* doc. 12, at 12-14; doc. 15, at 4-6, 13, the court utilizes a summary judgment standard of review.

[7] To the extent that King brings a separate claim for personal mental anguish as a result of GM Canada's purported negligence and violation of the Alabama Extended Manufacturer's Liability Doctrine, *see* doc. 1, at 16, the applicable statute of limitations is also two years, and the analysis remains unchanged. *See Locke v. Ansell Inc.*, 899 So. 2d 250, 251 n.2 (Ala. 2004). However, the court doubts King's ability to seek personal damages when he filed suit solely in his capacity "*as the personal representative* of the estate of Willie Lyle King." Doc. 1, at 11 (emphasis added). *See e.g.*, *Williams v. Nolin*, 484 So. 2d 428, 429-30 (Ala. 1986) (differentiating between suits filed in one's personal as opposed to representative capacity).

(Ala. 1992).

However, as King's amendment occurred before removal, the Alabama

Rules of Civil Procedure allow, in certain circumstances, including the limitation

period for Alabama's wrongful death statute, "relation back" when amending

complaints.  *See* Ala. R. Civ. P. 15(c).  *See also* Ala. Code § 6-5-410(d); *FMC*

*Corp.*, 599 So. 2d at 594.  Alabama's relation back rule provides that:

> An amendment of a pleading relates back to the date of the original
> pleading when
>
> (1) relation back is permitted by the law that provides the statute of
> limitations applicable to the action, or
>
> (2) the claim or defense asserted in the amended pleading arose out of
> the conduct, transaction, or occurrence set forth or attempted to be set
> forth in the original pleading, except as may be otherwise provided in
> Rule 13(c) for counterclaims maturing or acquired after pleading, or
>
> (3) the amendment, *other than one naming a party under the party's*
> *true name after having been initially sued under a fictitious name*,
> changes the party or the naming of the party against whom a claim is
> asserted if the foregoing provision (2) is satisfied and, within the
> applicable period of limitations or one hundred twenty (120) days of
> the commencement of the action, whichever comes later, the party to
> be brought in by amendment (A) has received such notice of the
> institution of the action that the party will not be prejudiced in
> maintaining a defense on the merits, and (B) knew or should have
> known that, but for a mistake concerning the identity of the proper
> party, the action would have been brought against the party, or
>
> (4) relation back is permitted by principles applicable to fictitious
> party practice pursuant to Rule 9(h).

Ala. R. Civ. P. 15(c) (emphasis added).  In turn, Alabama Rule of Civil Procedure

9(h) provides that: "When a party is ignorant of the name of an opposing party and so alleges in the party's pleading, the opposing party may be designated by any name, and when that party's true name is discovered, the process and all pleadings and proceedings in the action may be amended by substituting the true name."

Here, it is undisputed that King amended his complaint to substitute GM Canada for the eighteen fictitious parties *after* the applicable two year limitation period. *See* doc. 15, at 9-10; doc. 12, at 12. Willie Lyle King died on November 16, 2008, doc. 15, at 2, and as such, the § 6-5-410(d) limitation period ended on November 16, 2010. While King filed his original complaint naming the fictitious parties on November 15, 2010—within the limitation period—King amended the complaint to add GM Canada on May 10, 2011—nearly six months after the limitation period expired. *See* doc. 1, at 10-11. Accordingly, the pertinent question before this court is whether King's May 10, 2011 amendment, which added GM Canada, relates back to the November 15, 2010 original pleading date.[8] GM Canada contends that relation back is not available to King pursuant to Ala. R. Civ. P. 15(c)(4) and Rule 9(h). Doc. 12, at 24-28. King, however, asserts that relation back is available here because he satisfies Ala. R. Civ. P. 15(c)(3). Doc.

---

[8] The court notes that King's original November 15, 2010 complaint may not have been valid in-and-of-itself because King filed the original suit against two bankrupt entities—GM Corporation and Bill Heard Chevrolet. While not raised by GM Canada in its initial motion, King's original complaint was likely *void ab initio*, and therefore, King has no valid complaint for which to "relate back." *See Dudley v. Dudley*, No. 2100377, 2011 WL 6117922, at *2 (Ala. Civ. App. 2011) (finding "[v]iolations of the [bankruptcy] automatic stay are void for all purposes. Their ineffectiveness is permanent, not temporary.") (citations omitted).

15, at 8-13.  As such, before addressing the merits, the court must first determine the proper subsection of Rule 15(c) at issue.

King improperly focuses on Alabama Rule of Civil Procedure 15(c)(3), *see* doc. 15, at 9-14, because the proper relation back analysis with fictitious party practice involves Rule 15(c)(4) and Rule 9(h).[9]  *See Kinard v. C.A. Kelly and Co., Inc.*, 469 So. 2d 133, 135 (Ala. 1985) (finding that Ala. R. Civ. P. 9(h) and 15(c)(4) apply when the amendment substitutes a defendant's true name for a fictitious name as opposed to changing the party against whom a claim is asserted).  The plain language of Rule 15(c)(3) unequivocally applies to amended pleadings "*other than* one naming a party under the party's true name after having been initially sued under a fictitious name." Ala. R. Civ. P. 15(c)(3) (emphasis

---

[9] Accordingly, King's reliance on *Krupski v. Costa Crociere*, 130 S. Ct. 2484 (2010), and *Ex Parte Novus Utils., Inc.*, No. 1101127, 2011 WL 6004618 (Ala. 2011), is misplaced.  *See* doc. 15, at 8-13.  The Alabama Supreme Court in *Novus* specifically addressed Ala. R. Civ. P. 15(c)(3), not Rule 15(c)(4).  2011 WL 6004618, at *8.  Moreover, the Alabama Supreme Court noted that the United States Supreme Court's holding in *Krupski* applied to Rule 15(c)(3).  *Id.*  The court finds it disingenuous to argue that a Rule 15(c)(3) analysis also applies to Alabama's "fictitious party" practice, when the plain language of Rule 15(c)(3) unequivocally excludes fictitious parties from its parameters.  And indeed, the analysis regarding Rule 15(c)(4) and 15(c)(3) differ significantly.  *Compare Ex Parte Mobile Infirmary Ass'n*, 74 So. 3d 424, 428 (Ala. 2011), *with Novus*, 2011 WL 6004618.  Again, King explicitly utilized fictitious parties under Rules 15(c)(4) and 9(h).  *See* doc. 1, at 10.  Accordingly, while *Krupski* does state that Fed. R. Civ. P. 15(c)(1)(C) "plainly sets forth an exclusive list of requirements for relation back, and the amending party's diligence is not among them," 130 S. Ct. at 2496, where, as here, the proper "relation back" analysis must proceed under Ala. R. Civ. P. 15(c)(4) and 9(h), the amending party "must have been ignorant of the true identity of the defendant and must have used due diligence in attempting to discover it."  *Ex Parte Nationwide Ins. Co.*, 991 So. 2d 1287, 1291 (Ala. 2008) (quotation marks and citations omitted).  *See also Mobile Infirmary*, 74 So. 3d at 428 (holding that, when questioning the propriety of relation back for fictitiously named defendants, "the answer to that question depends upon the plaintiff's conduct").

added).[10]  And indeed, here, rather than changing party-defendant GM Corporation to GM Canada, King explicitly "substitutes GENERAL MOTORS OF CANADA, LTD., *for fictitious parties, 1-18.*"  Doc. 1, at 10 (emphasis added).  Put differently, the Amended Complaint, *id.*, attempts to pursue claims against both GM Corporation and GM Canada.  *See Kinard*, 468 So. 2d at 135 ("An amendment pursuant to Rule 9(h) substituting the defendant's true name for a fictitious one is not an amendment changing the party against whom a claim is asserted.").

Consequently, in order to invoke the relation back principles under Rule 15(c)(4) and Rule 9(h), "the original complaint must [first] 'adequately describe the fictitiously named defendant and state a claim against such defendant.'" *Ex Parte Nationwide Ins. Co.*, 991 So. 2d 1287, 1291 (Ala. 2008) (quoting *Fulmer v. Clark Equip. Co.*, 654 So. 2d 45, 46 (Ala. 1995)).  Second, "a party 'must have been ignorant of the true identity of the defendant and must have used due diligence in attempting to discover it.'" *Id.* (quoting *Pearson v. Brooks*, 883 So. 2d 185, 191 (Ala. 2003)).  The parties do not dispute the first factor, but GM Canada asserts that King failed to exercise due diligence in ascertaining its identity as the manufacturer of the vehicle in question.  The proper "standard for determining

---

[10] The 1995 committee comments further provide that the current form of the applicable Rule 15 subsections "more clearly preserves the *separate basis* for relation back under Alabama fictitious party practice pursuant to Rule 9(h)." Ala. R. Civ. P. 15, committee comments to October 1, 1995, Amendment to Rule 15 (emphasis added).

whether a party exercised due diligence in attempting to ascertain the identity of the fictitiously named defendant 'is whether the plaintiff knew, or should have known, or was on notice, that the substituted defendants were in fact the parties described fictitiously.'" *Id.* (quoting *Davis v. Mims*, 510 So. 2d 227, 229 (Ala. 1987)).  To aid in this determination, Alabama courts "look[] to, among other things, whether the plaintiff has conducted formal or informal discovery."  *Ex parte Tate & Lyle Sucralose, Inc.*, No. 1100404, 2011 WL 4507333, at *3 (Ala. 2011).  Finally, the Alabama Supreme Court instructs that "the purpose of Rule 9(h) is not to toll the statutory period of limitations to give plaintiffs more time to formulate a cause of action, but to extend the time in emergency situations where the plaintiff knows he has been injured and has a cause of action against some person or company, but cannot determine through due diligence the party's name." *Pearson*, 883 So. 2d at 191.

For example, in *Ex Parte Nationwide*, plaintiff and Verner Lee Herron ("Herron") had an automobile accident on September 1, 2000.  991 So. 2d at 1289.  Nationwide insured plaintiff's vehicle, and the insurance policy included uninsured/underinsured-motorists coverage.  In August 2002, plaintiff sued Herron and included fictitiously named defendants such as "those persons or entities which issued and/or owe benefits and coverage pursuant to uninsured and/or underinsured motorists to Plaintiff."  *Id.*  In June 2007, nine months after the applicable statutory period expired, plaintiff moved the trial court "to substitute Nationwide for one of the fictitiously named defendants listed in the

complaint." *Id.*  Nationwide moved to dismiss, claiming that the applicable statute of limitations barred plaintiff's claims, and plaintiff could not properly invoke relation back because she failed to exercise due diligence in ascertaining Nationwide's identity.  *Id.* at 1290.  While the trial court denied Nationwide's motion, the Alabama Supreme Court reversed, and concluded that, under Ala. R. Civ. P. 15(c)(4) and 9(h), plaintiff's "amendment to substitute Nationwide for a fictitiously named defendant does not relate back to the date of her original complaint because she knew or should have known Nationwide's identity at the time of her accident." *Id.* at 1291.  The court found that, even if it were to assume that plaintiff did not actually know of Nationwide's identity, "[plaintiff] could have discovered Nationwide's identity and the existence of UIM coverage simply by examining her policy." *Id.*

Similarly, in *Fulmer*, the court considered a plaintiff who sued a co-employee and a fictitiously named manufacturer after a forklift accident.  654 So. 2d at 45.  Plaintiff amended his complaint to substitute the forklift manufacturer, Clark Equipment Company ("Clark"), for the fictitious party, but did so after the applicable statute of limitations expired.  Plaintiff argued that the amendment should relate back to the original complaint because he "persistently stuck with discovery until Clark [Equipment] was correctly added" and "put forth much effort to identify the manufacturer" by asking co-employees about the forklift's manufacturer.  *Id.* at 46 (alteration in original).  However, after learning that "Clark" built the forklift, plaintiff "still did nothing calculated to determine the full

name of the manufacturer." *Id.* The court agreed with Clark that plaintiff failed to exercise the requisite due diligence in ascertaining the identity of the forklift manufacturer because "Clark Equipment forklifts have their names clearly listed on the nameplate," and plaintiff's employer maintained "an operator's manual and a parts manual, each of which provides the name of the manufacturer." *Id.* Therefore, the court concluded that plaintiff's "amendment substituting Clark Equipment Company does not relate back to the date of the original complaint, and any action against Clark Equipment is barred by the applicable statute of limitations." *Id.*

Most recently in *Ex Parte Mobile Infirmary Association*, 74 So. 3d 424 (Ala. 2011), the court reaffirmed these principles regarding relation back for Alabama's fictitious party practice. In *Mobile Infirmary*, plaintiff, as the personal representative of his deceased wife, sued Infirmary Health Systems, Inc. ("IHS") and several fictitiously named defendants for causing the death of his wife. *Id.* at 427. One week after Alabama's wrongful death statute of limitations expired, plaintiff served on IHS several interrogatories seeking to ascertain the "proper legal entity for the hospital commonly known as the Mobile Infirmary Medical Center." *Id.* IHS responded, identifying "Mobile Infirmary" as the correct legal entity. Seventeen days after the limitations period expired, Plaintiff attempted to amend his complaint to substitute Mobile Infirmary for one of the fictitious defendants. *Id.* The court held that, because plaintiff "failed to use due diligence in determining the true identity of Mobile Infirmary as the fictitiously named

defendant, . . . the amended complaint did not relate back to the filing of the original complaint." *Id.* at 428.  The court reasoned that, "when [plaintiff] filed the original complaint, [his wife's] family had possessed her medical records for 20 months, and [plaintiff] had possessed [her] medical records for at least 3 months, including various paperwork from Mobile Infirmary, which indicated that [the deceased] had been admitted to the Medical Center, had undergone surgery there, and had been treated there following her surgery." *Id.* at 429.  As such, a "reasonably diligent plaintiff possessing that information should have *at least attempted to identify the corporation doing business as Mobile Infirmary Medical Center and include it as a defendant.*" *Id.* (emphasis added).  Finally, the court concluded that where a "'plaintiff knows the identity of the fictitiously named parties or possesses sufficient facts to lead to the discovery of their identity at the time of the filing of the complaint, relation back under fictitious party practice is not permitted and the running of the limitations period is not tolled.'" *Id.* at 430 (quoting *Clay v. Walden Joint Venture*, 611 So. 2d 254, 256 (Ala. 1992)).

The plaintiff in *Mobile Infirmary* also argued that relation back is proper because defendant Mobile Infirmary was not prejudiced in the delay.  Specifically, plaintiff asserted that Mobile Infirmary suffered no prejudice because its counsel possessed knowledge of this suit in his role as counsel for IHS.  *Id.*  The court squarely rejected this argument stating that, in Alabama's fictitious party practice, "prejudice becomes a consideration only when an amendment would otherwise relate back to the time of filing; *lack of prejudice to the non-amending party will*

*not make an otherwise improper relation back proper*, where due diligence by the amending party is lacking." *Id.* (emphasis added).

Finally, *Crabtree v. BASF Building Systems, LLC*, No. 2091044, 2011 WL 2573382 (Ala. Civ. App. 2011), also sheds light on the due diligence required for relation back of an untimely amendment in Alabama's fictitious party practice.  In this slip-and-fall case, plaintiff filed suit against a named defendant and five fictitious defendants, including, as one of the fictitious parties, the entity that applied the substance that coated the parking deck at issue.  *Id.* at *1.  Three months later, plaintiff served interrogatories and requests for production on the named defendant.  Subsequently—but still within the applicable statutory limitation period—plaintiff served on the named defendant a second set of interrogatories seeking to ascertain "the name of the material applied to the parking deck, the name of the manufacturer of that material, and the date that the material had been applied to the deck . . . ."  *Id.*  Through this discovery, plaintiff learned that polyurethane coating had been applied to the parking deck and the identities of the contractor and subcontractor hired to install this coating.  *Id.* at *2.  Plaintiff also learned that Degussa Corporation ("Degussa") manufactured the polyurethane coating.  Two days before the statutory period elapsed, plaintiff amended his complaint to substitute the contractor and subcontractor for fictitious parties.  *Id.*  During the discovery period, plaintiff also subpoenaed non-party Degussa for information relevant to the manufacture of the polyurethane coating.  On June 9, 2006, four months after the statutory limitations period expired,

plaintiff learned—through discovery from the subcontractor—that Degussa actually "had been involved in the *application* of the polyurethane material on the parking deck" at issue. *Id.* (emphasis in original). Accordingly, plaintiff sought to amend his complaint to substitute Degussa for a fictitious party. The court found this amendment proper under the relation back principles for fictitious parties because plaintiff "exercised reasonable diligence in substituting" Degussa. *Id.* at *3. In finding such, the court rejected Degussa's argument that plaintiff failed to exercise due diligence by not amending the complaint as soon as plaintiff discovered that Degussa *manufactured* the polyurethane. *Id.* at *4. The court held that where "the manner that a certain product was applied . . . is alleged to have thereafter proximately caused an injury, the mere manufacturer of the material that was subsequently applied incorrectly is not, *ipso facto*, a proper defendant." *Id.*

    In applying the law to the facts here, the exercise of reasonable due diligence would have revealed, prior to the complaint being filed, that GM Canada manufactured the vehicle in question, given that such information is visibly listed on the vehicle's door. Doc. 12, at 61. *See Bowen v. Cummings*, 517 So. 2d 617, 618 (Ala. 1987) ("Fictitious party practice should not be abused and it was not intended for use whenever it is merely inconvenient for the plaintiff to learn the name of the true defendant."). And indeed, King provides in his brief that "[t]here was a sticker on the inside of the driver's side door on the wrecked vehicle that contains the information that General Motors of Canada LTD manufactured the vehicle, next to GM's trademarks, and further states that the vehicle was

manufactured in compliance with the U.S. FMVSS."  Doc. 15, at 9 n.2.  Similar to *Ex Parte Nationwide*, where plaintiff "could have discovered Nationwide's identity . . . simply by examining her policy," 991 So. 2d at 1291, King could have discovered GM Canada's identity as the manufacturer simply by inspecting the certification label located on the vehicle that gave rise to this suit.[11]  As King's theory of liability is based on the negligent or defective manufacture of the subject vehicle, *see* doc. 1, at 14-15, he cannot reasonably claim ignorance of GM Canada's identity at the time of filing the complaint when GM Canada is explicitly listed as the "manufacturer" on the vehicle's door.  *See Ex Parte Nationwide*, 991 So. 2d at 1291.  *Cf. Crabtree*, 2011 WL 2573382 (plaintiff excused from not amending his complaint upon knowledge of a product's manufacturer only because plaintiff's theory of liability was unrelated to the product's manufacture).  Similar to the plaintiffs in *Mobile Infirmary* and *Fulmer*, King possessed the vehicle and its attached certification label for almost twenty four (24) months prior to the statutory limitation period expiring, and he should have at least attempted to file suit against this entity clearly listed as the manufacturer.  *See Mobile Infirmary*, 74 So. 3d at 429; *Fulmer*, 654 So. 2d at 46.

---

[11] GM Canada also contends that the "VIN number of the subject truck unequivocally identifies GM Canada as the manufacturer of the subject vehicle."  Doc. 12, at 25.  To support this argument, GM Canada maintains that an individual can utilize the first three characters of a VIN number to identify the manufacturer through the NHTSA's website.  *Id.* at 13.  Finding the "certification label" located on the vehicle's door sufficient to award summary judgment, the court offers no opinion on whether a reasonably diligent plaintiff would need to utilize the NHTSA's website.

Moreover, King offers *no* evidence of *any* reasonable attempt to ascertain the identity of the fictitiously named defendants after the statutory period expired. *See generally* doc. 15.  As it relates to adding GM Canada, King provides: "[u]pon information received by counsel for Plaintiff regarding the proper identity of the manufacturer of the subject vehicle, GM Canada was substituted for fictitious parties 1-18," doc. 15, at 3; "[o]nly through information later obtained by Plaintiff was it discovered that GM was in bankruptcy and the proper defendant was GM Canada," *id.* at 9; "[w]hen the proper defendant was ascertained, it was substituted and served accordingly," *id.* at 13; "Plaintiff made every reasonable attempt to ascertain this information, which was ultimately revealed by Defendant," *id.* at 14. However, under Alabama's fictitious party practice, King is required to present evidence of due diligence in ascertaining the fictitious party's true identity.  *See Ex Parte Nationwide*, 991 So. 2d at 1291.  Although King claims to have "made every reasonable attempt to ascertain this information," he glosses over the key fact in this case—i.e., if King indeed acted with reasonable due diligence, the identity of GM Canada should have been known from day one.  Critically, King provides the court with no information to explain why he could not discern GM Canada's identity before the statute ran or what steps taken, if any, that ultimately led King to discover that GM Canada was the fictitious party it could not identify prior to the expiration of the statute.  The court is simply left with six months—from November 15, 2010 until May 10, 2011, *see* doc. 1, at 10-11—after the statutory period expired, of inactivity until presumably some entity informed

King of GM Canada's existence.  As such, Alabama law dictates that the court find that King failed to exercise reasonable due diligence in ascertaining the true identity of the fictitious defendants, and the May 10, 2011 amendment substituting GM Canada does not relate back to the original complaint.

Finally, King argues that this court should not bar his claims against GM Canada because "the real parties in interest were sufficiently alerted to the proceedings."  Doc. 15, at 12-13.  However, King added GM Canada through fictitious party practice, and the Alabama Supreme Court unequivocally stated that prejudice, or the lack thereof, to an added defendant "becomes a consideration only when an amendment would otherwise relate back to the time of filing; lack of prejudice to the non-amending party will not make an otherwise improper relation back proper, where due diligence by the amending party is lacking." *Mobile Infirmary*, 74 So. 3d at 430.  The court finds that King failed to exercise due diligence in determining the identity of GM Canada both before and after filing the original complaint; accordingly, under Alabama law, the court cannot excuse this lack of due diligence because GM Canada may not have been prejudiced by King's untimely amendment.

For the aforementioned reasons, by separate order, the court will **GRANT** GM Canada's motion for summary judgment and **DISMISS** King's claims against GM Canada **with prejudice**.

DONE the 18th day of April, 2012.

**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE